**IN THE UNITED STATED DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| SYSTEMS AMERICA, INC., a Delaware Corporation and NEXENT VENTURES LLC, a Delaware Corporation, <br><br>        Plaintiffs, <br><br>        v. <br><br> PROVIDENTIAL BANCORP, LTD., an Illinois Corporation; ROBERT JORDAN; DALE TURKEN, an individual; NOMAD VENTURES LLC, an Illinois Limited Partnership; INTERIMCEO, INC., an Illinois Corporation; BARRETT MIKELBERG, an individual; and SAMMY AVERBUCH, an individual, <br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)     Case. No. 05 C 2161<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Plaintiffs Systems America, Inc. ("Systems America") and Nexent Ventures LLC ("Nexent") filed an eight-count First Amended Complaint against Defendants Providential Bancorp, Ltd. ("PBL"), Robert Jordan ("Jordan"), Dale Turken ("Turken"), Nomad Ventures LLC ("Nomad"), Interimceo, Inc. ("Interimceo"), Barrett Mikelberg ("Mikelberg"), and Sammy Averbuch ("Averbuch"). Before the Court is Defendant PBL's Motion to Dismiss Counts I, II, III, V, and VI of Plaintiffs' First Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). As discussed below, the Court grants in part and denies in part PBL's motion.

# BACKGROUND

## I. Parties

Plaintiff Systems America is a corporation headquartered in Silicon Valley, Santa Clara County, California, whose principal place of business is San Jose, California. (R. 51-1; Pls.' First Am. Compl. ¶¶ 1, 12.) Adesh Kumar Tyagi ("Tyagi"), a citizen of California, owns 100 percent of Systems America's stock. (*Id.* ¶ 2.) Plaintiff Nexent is a limited liability corporation whose principal place of business is San Jose, California. (*Id.*) Tyagi is a member of Nexent. (*Id.*)

Defendant PBL is a mortgage brokerage corporation whose principal place of business is Chicago, Illinois. (*Id.* ¶¶ 3, 14.) Defendants Nomad and Interimceo are corporations whose principal place of business is Chicago, Illinois, and are shareholders of PBL. (*Id.* ¶ 3.) Defendant Jordan is a citizen of Illinois, managing partner of Interimceo, and a member of Nomad. (*Id.* ¶¶ 3, 4, 14.) Defendant Turken is a citizen of Illinois and a shareholder of PBL. (*Id.* ¶¶ 5, 16.) Defendant Mikelberg is a citizen of Illinois and is the president of PBL. (*Id.* ¶¶ 6, 29.) Defendant Averbuch is a citizen of Illinois. (*Id.* ¶ 7.)

## II. Plaintiffs' Claims

Plaintiffs' First Amended Complaint alleges violations of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.* (Count I), and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* (Count II), against all Defendants. Plaintiffs also allege trade libel (Count III) against Defendants Mikelberg and PBL, breach of written and oral contract (Counts IV and VII) against PBL, and other common law claims (Counts V, VI, and VIII) against all Defendants.

### III. Factual Allegations

#### A. The Term Sheet

On or about November 2003, Jordan, as managing partner of Interimceo, approached Tyagi in Tyagi's capacity with Nexent to discuss a potential investment in PBL. (R. 51-1; Pls.' First Am. Compl. ¶ 14.) As a result, Nexent and PBL entered into a written non-disclosure agreement. (*Id.*) During December 2003 and January 2004, Jordan and "PBL principals" negotiated the terms of the investment with Plaintiffs. (*Id.* ¶ 15.) The negotiations culminated in Turken and Tyagi's signing of a Term Sheet. (*Id.* ¶ 16.) Nexent agreed to invest $2 million in services provided by Systems America in exchange for Nexent's receipt of 16.66 percent of PBL's preferred stock. (*Id.*) Systems America also agreed to provide outsourcing services from India to originate, process, and close mortgages for PBL. (*Id.*)

After Plaintiffs and PBL executed the Term Sheet, Systems America assigned over one hundred of its employees in India to originate, process, and close mortgages for PBL. (*Id.* ¶ 17.) Plaintiffs estimate the worth of these services at approximately $1,187,000. (*Id.*) Tyagi also provided PBL with a list of mortgage companies for possible acquisition by Nexent or PBL. (*Id.* ¶ 18.) Turken thereafter forwarded an e-mail to PBL's staff praising Systems America for its work. (*Id.*) Moreover, Turken expressed PBL's desire to promptly sign a Services Agreement with Plaintiffs. (*Id.*) Plaintiffs allege that they relied on Turken's representations and continued to provide services to PBL pursuant to the Term Sheet. (*Id.*) On February 17, 2004, Turken forwarded an email to Tyagi again praising Systems America's work and informing him that "your staff did an outstanding job this weekend." (*Id.* ¶ 21.) In the spring of 2004, Turken selected some of Plaintiffs' employees as Loan Officers. (*Id.* ¶ 26.)

3

In or around March 2004, PBL prepared and Turken forwarded to Tyagi various documents concerning Plaintiffs' acquisition of PBL stock. (*Id.* ¶ 20.) On March 22, 2004, Tyagi, representing Systems America, agreed to the terms of the documents sent by Jordan. (*Id.* ¶ 22.) Tyagi then sent a Service Agreement to Jordan and Jordan sent a corrected version of that agreement back to Tyagi. (*Id.*)

### B. Telemarketing

According to Plaintiffs, in early 2004, PBL provided a list of persons for Systems America's employees to call for telemarketing purposes. (*Id.* ¶ 25.) Plaintiffs allege they subsequently learned that PBL failed to eliminate from that list numbers included in the National Do-Not-Call Registry ("DNCR"). (*Id.*) In April or May 2004, the State of Wisconsin sent a warning letter to Plaintiffs asserting that Plaintiffs' employees had placed marketing calls to phone numbers included in the DNCR. (*Id.*) Plaintiffs further allege that although Defendants failed to obtain a "SAN" number, which federal law requires before a company may place telemarketing calls, PBL represented to Plaintiffs that they had already obtained a SAN number. (*Id.*)

### C. Proprietary Software

Plaintiffs further allege that in or about February 2004, Systems America, in reliance on its contractual relationship with PBL, created a computer program, "DreamONE," specifically designed for the mortgage industry, and presented the program to Defendants. (*Id.* ¶ 19.) PBL subsequently copied DreamONE to its server in Chicago, Illinois. (*Id.*) In or about March 2004, PBL began using the DreamONE software. (*Id.* ¶ 22.) Early in 2004, Turken allegedly sent an e-mail to Plaintiffs regarding the use of additional software "Encompass." (*Id.* ¶ 23.) Thereafter, PBL provided Plaintiffs with a copy of the Encompass software. (*Id.*) Plaintiffs

4

contend that they later learned the copy of Encompass provided by PBL was an illegal copy of the software. (*Id.*) Encompass is allegedly owned and built by Ellie Mae, Inc., a company which is not a party to this lawsuit. (*Id.*)

### D. Plaintiffs' Invoices

Shortly after Plaintiffs presented the DreamONE software to Defendants, Systems America forwarded an invoice to PBL for its services. (*Id.* ¶ 19.) Plaintiffs allege that Defendants represented that they would compensate Plaintiffs for the brokering services in India and for the software program pursuant to the parties' agreement. (*Id.*)

From February 2004 to September 2004, Plaintiffs allegedly sent reports to PBL detailing the hours that Plaintiffs' employees had worked pursuant to the parties' agreement. (*Id.* ¶ 24.) The billing reports outlined the hourly billing rates set forth in a "Fees and Charges" schedule to which Defendants had orally agreed. (*Id.*) Defendants allegedly agreed to pay Plaintiffs a share of the revenue generated by the brokering services as "incentive compensation." (*Id.*) These incentive payments were memorialized in the "Fees and Charges" schedule. (*Id.*) According to Plaintiffs, Defendants never objected to the services provided by Plaintiffs and continued to praise Plaintiffs' work. (*Id.*) Plaintiffs further allege that despite its representations to the contrary, PBL never intended to pay for the services. (*Id.* ¶ 53.)

### E. Potential Acquisition

In or about June 2004, Jordan allegedly told Tyagi that PBL was "not doing that well in terms of revenues and profitability." (*Id.* ¶ 27.) Jordan proposed a plan whereby Plaintiffs would acquire PBL as an alternative to PBL paying for the services, and sent financial statements to Plaintiffs for acquisition consideration. (*Id.*) Nevertheless, when Nexent offered to purchase 100 percent of PBL's stock, PBL declined the offer. (*Id.* ¶ 28.) Plaintiffs then

5

demanded immediate payment of the debt owed by PBL. (*Id.*) Jordan allegedly responded to the demand for payment by sending a message to Tyagi, stating "please let me remind you that when we talked, I stated that we would honor our commitments." (*Id.*)

Later that summer, however, Defendants refused to pay Plaintiffs. (*Id.* ¶ 29.) Mikelberg thereafter allegedly told clients and competitors that Plaintiffs "did not know how to do business and could not be trusted." (*Id.*) Plaintiffs allege that Defendants' disparaging statements to persons in Plaintiffs' business circles misrepresented the nature, character, and quality of Plaintiffs' services, competency, skills, and integrity, and injured Plaintiffs' ability to sell their services. (*Id.* ¶¶ 40-42.) Plaintiffs further allege that the false statements disrupted their relationships with their prospective clients. (*Id.*) In addition, Plaintiffs allege that third parties have invested more than $1 million in PBL as a "direct consequence" of the services that Plaintiffs provided to PBL. (*Id.* ¶ 30.)

## IV. Procedural History

On April 4, 2005, the United States District Court for the Northern District of California transferred this action to this District. *See Systems Am., Inc. v. Providential Bancorp, Ltd.,* 2005 WL 757553 (N.D. Cal. April 4, 2005). The California court found that it lacked personal jurisdiction over Defendants and that venue in the Northern District of California was improper. *Id.* On June 22, 2005, PBL filed a motion to dismiss Plaintiffs' Complaint in this Court. (R. 41-1; PBL's Mot. to Dismiss Pls.' Compl.) On August 19, 2005, the Court granted PBL's motion in part, dismissing Plaintiffs' California state law claims and granting Plaintiffs leave to amend the complaint to plead claims under Illinois law. *Systems Am., Inc. v. Providential Bancorp, Ltd.*, 2005 WL 2008926 (N.D. Ill. Aug. 19, 2005). Plaintiffs filed their First Amended Complaint on September 16, 2005. (R. 51-1; Pls.' First Am. Compl.) On October 11, 2005, PBL filed the

6

present Motion to Dismiss Plaintiffs' First Amended Complaint pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6). (R. 54-1; PBL's Mot. to Dismiss.)

**LEGAL STANDARD**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of a complaint, not the factual sufficiency. *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 675-76 (7th Cir. 2001). The Court will only grant a motion to dismiss if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Centers v. Mortgage, Inc.*, 398 F.3d 930, 933 (7th Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). In other words, a plaintiff's complaint will survive if it "narrates an intelligible grievance that, if proved, shows a legal entitlement to relief." *United States Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 626 (7th Cir. 2003). In making its determination, the Court must assume the truth of the facts alleged in the pleadings, construe the allegations liberally, and view them in the light most favorable to the plaintiff. *Centers*, 398 F.3d at 333.

**ANALYSIS**

**I.      Plaintiffs' Non-Fraud Claims**

PBL asserts that the Court should apply the heightened pleading standard under Federal Rule of Civil Procedure 9(b) to Counts I, II, III, V, and VI, because Plaintiffs' entire complaint is "grounded in fraud." The Court disagrees. PBL's reliance on the Ninth Circuit's[1] opinion in *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097 (9th Cir. 2003), is misplaced. While the *Vess* court observed that a plaintiff who alleges a "unified course of fraudulent conduct" has pled a

---

[1] The Court reminds the parties that Seventh Circuit case law is controlling, precedential authority in the Northern District of Illinois.

complaint "grounded in fraud," *Id.* at 1103, the court concluded that where a complaint alleges both fraudulent and non-fraudulent conduct, "only allegations ('averments') of fraudulent conduct must satisfy the heightened pleading requirements of Rule 9(b). Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)." *Id.* at 1104-05.

Rule 9(b) applies "only to fraud and mistake and nothing else." *Kennedy v. Venrock Assoc.*, 348 F.3d 584, 593 (7th Cir. 2003). Even where a plaintiff alleges that the defendant has made misrepresentations and material omissions, where he is not charging fraud, "Rule 9(b) falls out of the picture." *Id.* Because Plaintiffs' claims in Count I (Trade Secrets Act violations), Count III (Trade Libel), and Count V (Conversion) do not allege fraudulent conduct, the Court will evaluate the sufficiency of these allegations under the liberal federal notice pleading requirements governed by Federal Rule of Civil Procedure 8(a)(2).

Under Rule 8(a)(2), a complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." This statement must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 507, 122 S.Ct. 992, 995 (2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). As explained below, Plaintiffs have satisfied the liberal notice pleading requirements with respect to Counts I and III.

### A. Illinois Trade Secrets Act (Count I)

To state a claim for violation of the Illinois Trade Secrets Act, 765 ILCS 1065/1 *et seq.*, a plaintiff must plead that the information at issue was: (1) a trade secret; (2) misappropriated; and (3) used in the defendants' business. *Associated Underwriters of Am. Agency, Inc. v. McCarthy,* 356 Ill.App.3d 1010, 1019, 826 N.E.2d 1160, 292 Ill.Dec. 724 (Ill.App.Ct. 2005).

PBL argues that the First Amended Complaint fails to identify precisely which trade secret was allegedly misappropriated. PBL's argument is dubious at best. Paragraph 19 of the First Amended Complaint alleges that "Systems America developed a software program entitled, "DreamONE." (R. 51-1; Pls.' First Am. Compl. ¶ 19.) Plaintiffs further allege that PBL "copied the DreamONE software to its server located in Chicago" and used the DreamONE software "developed and owned by SYSTEMS AMERICA" in PBL's business. (*Id.* ¶¶ 19, 22.) Finally, Plaintiffs allege that PBL refused to compensate Plaintiffs for their services in developing the software. (*Id.* ¶¶ 28-29, 31.) These allegations satisfy the liberal pleading requirements of Rule 8(a)(2) by identifying the trade secret as the DreamONE software, and by alleging that PBL misappropriated DreamONE and then used DreamONE in its business. Therefore, the Court denies PBL's Motion to Dismiss Count I of the First Amended Complaint.

**B.    Trade Libel (Count III)**

Next, PBL argues that Plaintiffs failed to properly allege a trade libel claim. Specifically, PBL contends that when a plaintiff corporation asserts a claim for trade libel, the complaint must allege that the defendant made statements that "assail the corporation's financial position or business methods, or accuse it of fraud or mismanagement." *See Geske & Sons, Inc. v. National Labor Relations Bd.*, 103 F.3d 1366, 1373 (7th Cir. 1997) (citing *Vee See Constr. Co., Inc. v. Jensen & Halsted, Ltd.*, 79 Ill.App.3d 1084, 399 N.E.2d 278, 281 (Ill.App.Ct. 1979)).

Here, Plaintiffs allege that in the Summer of 2004, Mikelberg, as President of PBL, "made derogatory comments regarding plaintiffs to other clients and competitors, and said plaintiffs did not know how to do business and could not be trusted." (R. 51-1; Pls.' First Am. Compl. ¶ 29.) Plaintiffs further allege that Defendants "knowingly used false statements to disparage and misrepresent the nature, character, and quality of plaintiffs' services, competency,

9

skills, and integrity" and that Defendants made false "comments to third parties in the plaintiffs' business circles." (*Id*. ¶ 40.)

These allegations put Defendants on notice of Plaintiffs' claims and facts that support those claims. *See Conley v. Gibson,* 355 U.S. at 47. Plaintiffs' allegations give a simple explanation of the content of the statements as well as some detail about the parties and time period, which satisfy the requirements of Rule 8(a)(2). *See Swierkiewicz v Sorema N.A.*, 534 U.S. at 512-13 ("notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues"). PBL's motion is denied as to Count III.

### C. Conversion (Count V)

PBL further contends that Plaintiffs have failed to state a claim sounding in conversion because they fail to allege what property was converted, how Plaintiffs derived their right to the property, or whether Plaintiffs demanded possession of the property. The Court dismisses Count V because the Illinois Trade Secrets Act preempts Plaintiffs' conversion claim as alleged.

Under Illinois law, to state a claim for conversion a plaintiff must allege that "(1) he has a right to the property; (2) he has an absolute and unconditional right to the immediate possession of the property; (3) he made a demand for possession; and (4) defendant wrongfully and without authorization assumed control, dominion, or ownership over the property." *See Cirrincione v. Johnson,* 184 Ill.2d 109, 114, 703 N.E.2d 67, 70, 234 Ill. Dec. 455 (Ill. 1998).

Paragraph 49 of the First Amended Complaint states that Plaintiffs developed the DreamONE software and had "an ownership interest in and were entitled to possession of their intellectual property relating to the DreamONE software." (R. 51-1; Pls.' First Am. Compl. ¶¶ 19, 49.) Plaintiffs further state that Defendants "took plaintiffs' property from plaintiffs' possession and converted it to their own use," and used the plaintiffs' proprietary intellectual

10

property for their own "marketing and promotional materials." (*Id.* ¶ 50.) Finally, Plaintiffs allege they demanded payment for their services in developing the software, but Defendants refused to pay. (*Id.* ¶¶ 28, 29, 31.)

Although these allegations would state a claim for conversion under the liberal notice pleading requirements of Rule 8(a)(2), the Illinois Trade Secrets Act (ITSA) preempts claims arising from the misappropriation of trade secrets other than claims based on breach of contract. *See Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005) (quoting Section 8(a) of the ITSA, "this Act is intended to displace conflicting tort, restitutionary, unfair competition, and other laws of this State providing civil remedies for misappropriation of a trade secret."). In *Hecny*, the Seventh Circuit observed that very few Illinois courts have addressed the scope of preemption under ITSA. *Id.* Based on a review of other states' decisions interpreting the Uniform Trade Secrets Act of 1985 (on which ITSA is based), the *Hecny* Court concluded that "[t]he dominant view is that claims are foreclosed only when they rest on the conduct that is said to misappropriate trade secrets." *Id.* at 404-05. This limitation on preemption is supported by the Uniform Law Commissioners' comment to the model act, which states, "The [provision] does not apply to duties imposed by law that are not dependent upon the existence of competitively significant secret information, like an agent's duty of loyalty to his or her principal." *Id.* at 405; *see also AutoMed Techs., Inc. v. Eller,* 160 F.Supp.2d 915, 922 (N.D. Ill. 2001) (holding that the plaintiff's claim for conversion of software was preempted by ITSA, but observing that "ITSA only preempts actions predicated on misuse of secret information. Common law claims based on different theories are still permissible.")

Because Plaintiffs' conversion claim rests solely on Defendants' alleged misappropriation of the DreamONE software, it is preempted by ITSA. The Court therefore dismisses it with prejudice.

## II. Plaintiffs' Fraud Claims

### A. Consumer Fraud and Deceptive Business Practices Act (Count II)

Next, PBL argues that Plaintiffs' allegations of violations of the Consumer Fraud and Deceptive Practices Act ("the Act'), 815, ILCS 505/1 *et seq.,* are ambiguous and make it impossible for Defendants to adequately defend. As explained below, Count II fails for reasons unrelated to ambiguity.

To state a claim under the Act, a plaintiff must allege that (1) defendants committed a deceptive act; (2) defendants intended to induce consumer reliance on the deception; and (3) the deception occurred during trade or commerce. *Weatherman v. Gary-Wheaton Bank of Fox Valley, N.A.,* 186 Ill.2d 472, 492, 713 N.E.2d 543, 239 Ill.Dec. 12 (Ill. 1999). The Illinois Supreme Court recently made clear that allegations of a failure to fulfill contractual obligations do not necessarily give rise to a claim under the Act. *Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill.2d 100, 169, 835 N.E.2d 801, 844, 296 Ill.Dec. 448 (Ill. 2005). If this were not so, the Act would "supplement every breach of contract claim with a redundant remedy." *Id.* Rather, the Act contemplates that a "deceptive act or practice". . . must involve "more than the mere fact that a defendant promised something and then failed to do it [since] [t]hat type of 'misrepresentation' occurs every time a defendant breaches a contract." *Id.* (quoting *Zankle v. Queen Anne Landscaping,* 311 Ill.App.3d 308, 312, 724 N.E.2d 988, 244 Ill.Dec. 100 (Ill.App.Ct. 2000) and citing cases).

In disputes between two businesses that are not consumers, the test for whether the Act applies is "whether the alleged conduct involves trade practices addressed to the market generally or otherwise implicates consumer protection concerns." *Peter J. Hartmann Co. v. Capital Bank & Trust Co.,* 296 Ill.App.3d 593, 604, 694 N.E.2d 1108, 1117, 230 Ill.Dec. 830 (Ill.App.Ct. 1998) (quoting *Lake County Grading Co. of Libertyville, Inc. v. Advance Mech. Contractors, Inc.,* 275 Ill.App.3d 452, 459, 654 N.E.2d 1109, 211 Ill.Dec. 299 (Ill.App.Ct. 1995) and *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.,* 190 Ill.App.3d 524, 534, 546 N.E.2d 33, 137 Ill.Dec. 409 (Ill.App.Ct. 1989)). A plaintiff must therefore either allege it was a consumer of the defendant or allege a nexus with Illinois consumers. *Downers Grove,* 190 Ill.App.3d at 534. To meet this "consumer nexus" requirement, the Illinois Appellate Court and the federal courts sitting in Illinois have "uniformly held" that a plaintiff must allege "that the conduct involves trade practices directed to the market generally or otherwise implicates consumer protection concerns." *Athey Prods. Corp; v. Harris Bank Roselle*, 89 F.3d 430, 437 (7th Cir. 1996) (citing *Rubin v. Marshall Field & Co.,* 232 Ill.App.3d 522, 532, 597 N.E.2d 688, 173 Ill.Dec. 714 (Ill.App.Ct. 1992)); *see also Brody v. Finch Univ. of Health Sciences/Chicago Med. School,* 298 Ill.App.3d 146, 160, 698 N.E.2d 257, 269, 232 Ill.Dec. 419 (Ill.App.Ct. 1998) (adopting the Seventh Circuit's reasoning in *Athey*).

Here, Plaintiffs' First Amended Complaint fails to allege the requisite consumer nexus. Rather, Count II simply re-alleges and incorporates by reference paragraphs 1 through 35 of the complaint and then adds that "[b]y engaging in the conduct herein alleged, defendants have violated the [Act]." (R. 51-1; Pls' First Am. Compl. ¶ 38.) Because Plaintiffs' First Amended

Complaint fails to plead a consumer nexus or facts that raise consumer protection concerns, the Court dismisses Count II without prejudice.

    **B.    Common Law Fraud (Count VI)**

Last, PBL contends that Plaintiffs have failed to allege their common law fraud claim in Count VI with the requisite specificity. Federal Rule of Civil Procedure 9(b) requires that a plaintiff charging fraud must plead the circumstances constituting the fraud with particularity. *Fidelity Nat. Title Ins. Co. of N.Y. v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745 (7th Cir. 2005). The complaint must identify the person who made the misrepresentation, the "time, place and content of the misrepresentation," and the method by which the misrepresentation was communicated. *General Elec. Capital Corp. v. Lease Resolution Corp.,* 128 F.3d 1074, 1078 (7th Cir. 1997). In other words, the complaint must allege the "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990).

The heightened pleading standard is intended "to minimize the extortionate impact that a baseless claim of fraud can have on a firm or an individual." *Fidelity*, 412 F.3d at 748. It compels a plaintiff to "provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless" and "forces the plaintiff to conduct a careful pretrial investigation." *Id.* at 749. In so doing, the Rule functions as "a screen against spurious fraud claims." *Id.*

The elements of a claim for common law fraud in Illinois are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statements;

14

and (5) plaintiff's damages resulting from reliance on the statement. *Connick v. Suzuki Motor Co., Ltd.*, 174 Ill.2d 482, 497, 675 N.E.2d 584, 591, 221 Ill.Dec. 389 (Ill. 1996).

Here, Plaintiffs allege that Defendants made a series of "false promises to induce plaintiffs to provide them with the services of plaintiffs and with the use of a software program" and that "[a]t the time the defendants made these representations, they did not intend to perform these promises." (R. 51-1; Pls.' First Am. Compl. ¶ 53.) Fraud predicated on an alleged promise made without any intent to perform is characterized as "promissory fraud," which is not actionable under Illinois law "unless it is part of a scheme to defraud, that is, unless it is one element of a pattern of fraudulent acts." *Speakers of Sport, Inc. v. ProServ, Inc.,* 178 F.3d 862, 866 (7th Cir. 1999) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.,* 131 Ill.2d 145, 545 N.E.2d 672, 682, 137 Ill.Dec. 19 (Ill. 1989)) (other citations omitted). The requirement that a plaintiff show a pattern of fraudulent acts is designed to reduce the likelihood of a spurious suit; "for a series of unfulfilled promises is better (though of course not conclusive) evidence of fraud than a single unfulfilled promise." *Speakers*, 178 F.3d at 866. The Court therefore reviews the allegations of Plaintiffs' First Amended Complaint to determine whether they articulate a "pattern of fraudulent acts," and if so, whether the allegations meet Rule 9(b)'s particularity requirements.

Plaintiffs allege that Jordan approached a representative of Nexent in November 2003 to solicit an investment in PBL, and that between November 2003 and January 2004 Jordan and Turken acted on behalf of PBL in negotiating various business agreements with Plaintiffs. (*Id.* ¶¶ 14-16, 20, 24, 27-28.) Plaintiffs pleaded specific dates on which discussions took place and the dates on which the parties exchanged draft agreements and revisions to the drafts. (*Id.*) Plaintiffs further allege that in January 2004, Jordan and Turken "traveled to plaintiff's facility in

15

India, in compliance with the terms set out in the Term Sheet." (*Id.* ¶ 16.) The First Amended Complaint identifies those who were present when the parties executed the written Term Sheet. (*Id.*) In addition, Plaintiffs provide copies of the parties' written agreements as exhibits to the First Amended Complaint. (*Id.*, Exh. 1, 2.)

Further, Plaintiffs identify Turken, a representative of PBL, as the individual who initially provided documents relating to PBL's stock offer to Plaintiffs. (*Id.* ¶ 20.) Plaintiffs further state that Turken sent an email on February 17, 2004 in which Turken reinforced PBL's satisfaction with the services Plaintiffs were providing. (*Id.* ¶ 21.) Plaintiffs allege they developed the DreamONE software and provided it to PBL in February 2004, acting in reliance on Defendants' representations that they would be compensated for "providing the mortgage brokering services in India, and for providing the DreamONE software program." (*Id.* ¶ 19.) Plaintiffs also state that they continued billing PBL for services provided from February 2004 through September 2004. (*Id.* ¶ 24.) During that time, PBL allegedly responded by agreeing to pay, and by indicating that it was pleased with Plaintiffs services, but did not, in fact, provide the promised payment. (*Id.* ¶¶ 24, 29, 31.)

Moreover, after Plaintiffs provided services to PBL for five to six months without receiving payment, Jordan informed Plaintiffs that PBL was "not doing that well," and proposed a new plan whereby Plaintiffs would acquire ownership of PBL instead of receiving payment. (*Id.* ¶ 27.) Plaintiffs agreed to consider the alternate arrangement and reviewed financial statements provided by Jordan pursuant to the proffered acquisition plan, but when Plaintiffs attempted to purchase PBL, their offer was refused. (*Id.* ¶¶ 27, 28.) Weeks later, Plaintiffs allege that Defendants informed them that Defendants would not pay for any of the services that had been provided by Plaintiffs. (*Id.* ¶ 29.)

According to the First Amended Complaint, from the very beginning, PBL never intended to make good on any of the promises it made and used a series of false promises and ongoing misrepresentations, some of which were set forth in written documents, to induce Plaintiffs to develop and provide software and to provide outsourced mortgage processing services and telemarketing services for over six months. (*Id.* ¶¶ 52-53.) In all, Plaintiffs allege they provided in excess of $1,187,000 worth of uncompensated services to Defendants.

Based on these allegations, Plaintiffs have alleged a pattern of fraudulent acts, and have pled the 'who, what, when, where, and how' of the pattern with sufficient particularity to survive PBL's Motion to Dismiss. The Court thus denies PBL's Motion to Dismiss Count VI.

## CONCLUSION

For the reasons discussed above, the Court denies Defendants' Motion to Dismiss with respect to Counts I, III, and VI. The Court dismisses Plaintiffs' Consumer Fraud and Deceptive Business Practices Act claim in Count II without prejudice. The Court dismisses Count V with prejudice as to claims of conversion of software or other trade secrets.

**Dated:** February 24, 2006

                                             **ENTERED:**

                                             */s/ Amy J. St. Eve*
                                             **AMY J. ST. EVE**
                                             **United States District Court Judge**